**BEAVER VALLEY POWER COMPANY, a Pa. Corp.**

v.

**NATIONAL ENGINEERING & CONTRACTING CO., an Ohio Corp.**

v.

**MICHAEL BAKER, JR., INC., 3rd Party Defendant.**

**Appeal of BEAVER VALLEY POWER COMPANY, Appellant.**

No. 88–3434.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1988.

Decided Aug. 31, 1989.

---

Robert B. Sommer, John M. Sylvester (Argued), Kirkpatrick & Lockhart, Pittsburgh, Pa., for appellant.

Chester S. Fossee (Argued), Reale, Fossee & Ferry, P.C., Pittsburgh, Pa., for appellee National Engineering & Contracting Co.

Mark J. Gesk, Francis X. McTiernan, Jr. (Argued), Wayman, Irvin & McAuley, Pittsburgh, Pa., for appellee Michael Baker, Jr., Inc.

Before SEITZ,* STAPLETON, and COWEN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

This appeal presents a modern version of an age-old problem: reconciling the mutually exclusive interests of riparian landowners. *See generally* Morton J. Horwitz, *The Transformation of American Law* 32–53 (1977). Pursuant to a contract with the Pennsylvania Department of Transportation (PennDOT), National Engineering & Contracting Co. (National), an Ohio corporation, built a bridge on the Beaver River, downstream from Beaver Valley Power Corp.'s (Beaver Valley) hydroelectric power station. After construction was completed, Beaver Valley, a Pennsylvania corporation, brought a diversity suit against National claiming trespass, negligence, and breach of contract. Beaver Valley asserted that, in building a dam for the bridge construction, National raised the level of the river, flooding Beaver Valley's station and otherwise impeding its ability to generate power. National prevailed on its motion for summary judgment on the ground that, under Pennsylvania law, the government contractor defense barred Beaver Valley's claims. The district judge also denied Beaver Valley's cross-motion for summary judgment, which was premised on the theory that National's construction of the dam was negligent per se and that Beaver Valley was a third-party beneficiary of the contract between National and PennDOT. These cross appeals followed. We will reverse the summary judgment granted in favor of National and affirm the denial of Beaver Valley's motion.

## I.

In the early 1980s, PennDOT decided to replace a bridge on the Beaver River, near the city of Beaver Falls. PennDOT hired Michael Baker Jr., Inc. (Baker) to draft plans for the project. The plans drafted by Baker (the Baker Plans) encompassed, among other things, a provision for the building of one or more cofferdams—temporary structures used in bridge-building to "dewater" the area around piers under construction and for use as a working platform. The Baker plans were sent to PennDOT by Baker in October 1982, and PennDOT thereafter forwarded them to the Pennsylvania Department of Environmental Resources (DER) to obtain a permit for constructing the bridge.[1] The permit was required by the Pennsylvania Dam Safety and Encroachment Act (the Dam Act), 32 P.S. § 693.1 *et. seq.* In January 1983, the DER approved PennDOT's application based on the Baker plans, "with the understanding that the work shall be performed in accordance with the maps, plans, profiles and specifications filed with and made part of the application." App. at 224. The DER permit was also conditioned upon approval by the Army Corps of Engineers. The permit stated that if work was not completed before December 31, 1985, the permit would become "null and void." App. at 226.[2]

After obtaining this permit, PennDOT solicited bids on the project. Appellee National was awarded the job, and a written contract was finalized on October 13, 1984. The contract did not incorporate by reference the Baker plans or any other plans. The contract did, however, contain a provision concerning the building of a cofferdam. National was required to submit a plan "detailing the location of the cofferdam and the materials to be used in its construction." Further, National had to "re-apply for any permits required by the appropriate regulatory agencies" if the submission "differ[ed] substantially" from

---

* Since the date of argument of this case, Judge Seitz has taken senior status.

1. We use the singular form of the noun "bridge," as have the parties, although the project as planned and executed involved the construction of two bridges, one for northbound and one for southbound traffic.

2. National cites to what it asserts is an extension of this permit. The extension, however, dated June 27, 1984, is a renewal of a permit with a different number (no. 04–23) than the one governing the plans at issue here (no. 04–53).

the plans previously approved by the Army Corps of Engineers.[3] App. at 222.

National submitted narrative descriptions and drawings indicating the size, materials, location, and timing of the cofferdams it proposed to build. PennDOT, in a response to this submission dated January 24, 1985, "concur[red] with the general cofferdam sequence scheme submitted" but asked National to address various comments it had written on the plans and noted generally that the plans did not "describe [the] work in sufficient detail." App. at 519. On February 7, 1985, National submitted amended plans regarding the cofferdams. Among other things, these plans stated that the "present time schedule" called for the removal of the East-bank cofferdam by the end of July 1986. App. at 240. These amended plans were approved by PennDOT on February 26.

National began construction in March 1985. Beaver Valley claims, and has support in the record for, two kinds of damage caused by the cofferdams. In November 1985, heavy flooding of the Beaver River occurred, causing damage to Beaver Valley's power station and occasional shutdowns. The record supports Beaver Valley's position that the cofferdams exacerbated the flooding. National does not categorically deny this, but argues that the "contribution of the cofferdam to the flooding [was] questionable" because the flooding was caused by heavy rains that breached the dam. App. at 213.

Beaver Valley's other form of damage is entirely uncontested. To generate hydroelectric power, the water must fall from an upper pool (above the hydroelectric dam) to a lower pool (below the hydroelectric dam). The amount of hydroelectric power generated by a plant is directly proportional to the vertical distance, or "head," between those pools. When a cofferdam is in place downstream from a dam, it raises the level of the water upstream, thereby raising the level of the lower pool, while the level of the upper pool remains the same. The

"head" is thus reduced. It follows that Beaver Valley generated less power as long as a cofferdam was in place and this, of course, would adversely affect its revenues. National does not controvert these assertions.

Beaver Valley asserts that it contacted National on numerous occasions, but that National refused to take any steps to alleviate Beaver Valley's problems. National admits conversations with some of Beaver Valley's employees, but denies that it was asked to provide "relief from the cofferdam." App. at 213.

After several months of construction, in an undated submission to PennDOT, National asked to revise its East-bank cofferdam plans. The submission called for widening this cofferdam to 24 feet and lengthening it one pier-width (about 120 feet). Although National's submission noted the last step to be the "complete[ ] remov[al]," app. at 269, of the East-bank cofferdam, no deadline was articulated. In a response dated July 25, 1986, PennDOT approved the revision "as noted," app. at 268, the quoted phrase an apparent reference to comments (presumably those of a PennDOT employee) written directly on National's submission indicating approval and further noting that National "must have standby equipment to breach [the] dam in case of high water." App. at 269.

The record supports Beaver Valley's contention that the last use of the East-bank cofferdam occurred in October 1986. Beaver Valley also asserts, and National acknowledges, that the entire East-bank cofferdam was not removed until June 1987, although National argues that part of the delay was caused by PennDOT.

In September 1986, Beaver Valley brought suit in the United States District Court for the Western District of Pennsylvania. It sought damages, as well as a mandatory injunction requiring the removal of river obstructions, based on three theories: trespass, negligence, and breach of contract, the latter based on the premise

3. The record does not contain any information about the approval of the Army Corps of Engineers.

that Beaver Valley was a third-party beneficiary of National's contract with PennDOT. National impleaded Baker, claiming that if National was liable to Beaver Valley, Baker was liable to National because of its design of the cofferdams. National also moved for dismissal on the ground that PennDOT was an indispensable party that could not take part in the lawsuit on account of the eleventh amendment. The motion was denied.

The district judge requested the parties to file motions for summary judgment to narrow the issues for trial. Baker filed a motion for full summary judgment, and Beaver Valley and National filed motions for partial summary judgment. Beaver Valley contended that it was entitled to judgment as to liability as a matter of law. It argued that the contract between National and PennDOT made Beaver Valley a third-party beneficiary, and that the contract was breached when National's construction of the cofferdams caused damage to Beaver Valley. Beaver Valley also argued that National had committed negligence per se through its violation of certain provisions of the Dam Act.

National's brief in opposition to Beaver Valley's motion asserted that any damage Beaver Valley may have sustained was the result of aspects of the bridge construction that were specified by PennDOT and that the government contractor defense therefore defeated Beaver Valley's claims. National's own motion for partial summary judgment argued that Beaver Valley, in constructing its power station, had not complied with a local ordinance. Accordingly, National urged that the latter, rather than any negligence on National's part, was the proximate cause of any flood damage incurred by Beaver Valley.

Baker argued that summary judgment should be entered in its favor because any damage incurred by Beaver Valley was the result of National's noncompliance with the Baker plans, not any fault in the Baker plans themselves.

The district judge granted summary judgment in favor of National solely on the basis of the government contractor defense. It concluded as follows:

> It is undisputed that defendant's contract with a governmental agency, PennDOT, mandated the placement of the cofferdams, and that the cofferdams were constructed in accordance with the plans and specifications supplied by PennDOT. Therefore, plaintiff can recover only by establishing negligence or willful misconduct. There is no suggestion that the cofferdams were erected in other than a competent and workmanlike fashion; it is the *fact* that they were constructed, rather than the manner of construction, which caused plaintiff's injuries.

Mem. & Order at 3, No. 86–448 (W.D.Pa. June 16, 1988) (citations omitted; emphasis in original).

The district judge then rejected Beaver Valley's claim that, if PennDOT violated the Dam Act by continuing construction with an expired DER permit, or by failing to abide by the terms of the permit, the government contractor defense did not apply. The district judge also dismissed Beaver Valley's assertion that National had not complied with the DER permit by failing to have standby equipment capable of breaching the cofferdams in the event of high waters. Finally, the district court rejected Beaver Valley's third-party beneficiary theory on the ground that the contract between PennDOT and National did not suggest an intent by the contracting parties to confer third-party beneficiary status upon Beaver Valley.

Accordingly, the district judge granted National's motion, treating it, however, as a motion for full, rather than partial, summary judgment. The judge denied Beaver Valley's motion and dismissed Baker's motion as moot.

## II.

The Pennsylvania Supreme Court first adopted what is now known as the common-law government contractor defense in *Ference v. Booth & Flinn Co.*, 370 Pa. 400,

88 A.2d 413 (1952).[4] In *Ference,* bus operators sued a company that had been hired by the state to extend a highway. The plaintiffs claimed that, in constructing the highway, a road was damaged by an earth slide, requiring that it be closed to traffic and causing damage to the plaintiffs' business. The Supreme Court premised its denial of liability on the state's immunity from suit. The court stated that "[i]t is hornbook law that the immunity from suit of the sovereign state does not extend to independent contractors doing work for the state" but nonetheless "a contractor [who] performs his work in accordance with the plans and specifications [of the state] and is guilty of neither a negligent nor a willful tort ... is not liable for any damage that might result...." 88 A.2d at 414.

The court noted that the defense may be invoked not only when the damage of which the plaintiff complained is caused by a particular government specification for the project, but also when that damage is a "necessary" consequence of the project as a whole: "Here it cannot seriously be argued that the obstruction of Beaver Road was unnecessary. Defendant was properly carrying out its contract with the Commonwealth when it caused the slide. Since plaintiffs concede that defendant was guilty of no negligence, in the way it performed the work, the inference is inescapable that the slide was a necessary result of following the plans and specifications of the contract. The only remaining question is whether the obstruction was removed within a reasonable time." *Id.* at 414–15.

The Pennsylvania Supreme Court again addressed the defense in *Valley Forge Gardens v. James D. Morrissey, Inc.,* 385 Pa. 477, 123 A.2d 888 (1956). In *Valley Forge,* the defendant had constructed a highway pursuant to a state contract and, in the process, it had followed plans calling for landfill. Erosion caused the landfill to wash into the plaintiff's ponds, eventually filling them. The Supreme Court noted that the work had been done in "strict accordance with the plans" and quoted with approval the Supreme Court of Minnesota: " 'That the state itself may have proceeded wrongfully in not foreseeing the consequential damage to plaintiffs' property and making provision for its compensation supports not at all the conclusion that either the highway commissioner or defendant [contractor] has committed wrong in proceeding with the work in the only way it could be done.' " *Id.* at 890–91 (quoting *Nelson v. McKenzie–Hague Co.,* 192 Minn. 180, 256 N.W. 96, 100 (1934)).

The court reiterated the sovereign immunity rationale underlying the rule:

**4.** The phrase "government contractor defense" has never been used by the Pennsylvania Supreme Court. The phrase apparently was first employed in *In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y. 1982). That case and most other cases using the phrase concern contracts of military contractors with the federal government. *See, e.g., Koutsoubos v. Boeing Vertol, Div. of Boeing Co.,* 755 F.2d 352 (3d Cir.1985); *McKay v. Rockwell Int'l Corp.,* 704 F.2d 444, 450 (9th Cir.1983) (requiring as element of defense that United States is immune under *Feres–Stencel* doctrine); *Shaw v. Grumman Aerospace Corp.,* 778 F.2d 736, 740 (11th Cir.1985) (Johnson, J.) (using phrase "military contractor defense" to describe defense based entirely on separation-of-powers rationale); *Mackey v. Maremont Corp.,* 350 Pa.Super. 415, 504 A.2d 908 (1986); *In re All Maine Asbestos Litigation,* 575 F.Supp. 1375, 1378 (D.Me. 1983) (Gignoux, J.) (raising question of whether defense applies outside of military context). *But see Price v. Tempo, Inc.,* 603 F.Supp. 1359, 1360 (E.D.Pa.1985) (allowing "government contract defense" in suit against fire glove manufacturer that contracted with City of Philadelphia). The notion of shielding contractors from liability for defective government specifications, however, dates at least as far back as *Yearsley v. W.A. Ross Const. Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), which held that a contractor building dikes pursuant to a government contract was not liable for erosion if the contractor's performance adhered to the government's specifications. *See generally* R. Ausness, *Surrogate Immunity: The Government Contract Defense and Products Liability,* 47 Ohio St.L.J. 985, 993–95 (1986). Although some courts have viewed the government contractor defense as doctrinally discrete from *Yearsley* and similar "government agency defense" cases, *see, e.g., Grumman Aerospace Corp.,* 778 F.2d at 739–40, this court has implicitly viewed the Pennsylvania Supreme Court's "government agency defense" cases as the progenitors of a "government contractor defense" in the federal military context. *See Brown v. Caterpillar Tractor Co.,* 696 F.2d 246, 250–53 (3d Cir.1982); *In re Air Crash Disaster at Mannheim, Germany on Sept. 11, 1982,* 769 F.2d 115, 122 & n. 9 (3d Cir.1985).

The statement that the State's or its instrumentality's immunity from suit is not available to the contractor who performs work for it in conformity with a contract and without negligence is largely a matter of semantics. It is true, as stated, that the contractor may not plead such immunity. But, if the contractor, in privity with the State or its instrumentality, performs the contract work which the State is privileged to have done, the privilege operates to relieve the contractor from liability to third persons except for negligence or wilful tort in performance of the work.

123 A.2d at 891.

Aside from the "sovereign immunity" rationale for the doctrine, the court also appeared to articulate another justification:

As recognized by the Supreme Court of Washington in *Muskatell v. Queen City Construction Co.*, 3 Wash.2d 200, 100 P.2d 380, 381, if the rule [of limited liability for contractors] were otherwise, "the bidding on contracts with a [governmental instrumentality] would be somewhat hazardous, because the contractor could never know what the amount of damages which he might have to pay to abutting property would be.

123 A.2d at 891. Our court has dubbed this an "efficiency" rationale, that is, "that the government contractor defense is essential to the smooth and predictable operation of government procurement programs." *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 250 (3d Cir.1982).

Aside from *Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432, 434–35 (1970), which held that the government contractor defense does not apply to an action involving ultrahazardous activities, the Pennsylvania Supreme Court has not addressed the government contractor defense since *Valley Forge*, leaving it for the lower state courts and the federal courts to grapple with some of the difficult issues it raises.

In *In re Air Crash Disaster at Mannheim, Germany, on Sept. 11, 1982*, 769 F.2d 115, 122–23 (3d Cir.1985), this court concluded that the Pennsylvania Supreme Court would adopt the formulation of the defense articulated by Judge Pratt in *In re "Agent Orange" Product Liability Litigation*, 534 F.Supp. 1046, 1055 (E.D.N.Y. 1982). That formulation requires the contractor to prove by a preponderance of the evidence (1) that the government established the specifications for the project or product; (2) that the project or product materially met those specifications; and (3) that the government knew as much or more than the defendant contractor about the hazards of the project or product.

The element in this formulation relevant to this appeal,[5] and one not directly dealt with in *Ference* or *Valley Forge*, is what it means to say that specifications or plans have been "established" by the government. We addressed that issue in *In re Air Crash Disaster at Mannheim* in the context of a military product liability suit where the contract was with the federal government. Applying Pennsylvania law, we concluded that "approval" by the government of a specification tendered by the contractor could constitute the "establishing" of that specification by the government. Rather than requiring the contractor to show that a particular specification originated with the government, we adopted the view we had espoused in *Koutsoubos v. Boeing Vertol*, 755 F.2d 352 (3d Cir.1985), interpreting federal common law, that the "government contractor defense is available to a contractor that participates in the design of the product, so long as the government's approval consists of more than a mere rubber stamp." We noted that government "approval" of a design could only be found where the government had "tru[ly] participat[ed]" and "substantial[ly] review[ed]" the design. 769 F.2d at 122, 123.

Although *In re Air Crash Disaster at Mannheim* was concerned with products liability, these principles should apply in non-products-liability cases as well. If we were to require that the defense be only available where the relevant specification

---

5. The parties have not raised the issue of the    third factor in the *Agent Orange* formulation.

originated with the government, we would create an incentive for contractors to refrain from making suggestions to the government about the execution of a project that might improve the quality or safety of that project. We emphasize, however, the nature of the government's participation that we required in *In re Air Crash Disaster*. The Pennsylvania Supreme Court's concern with strict adherence to specifications is predicated on a threshold finding that the specifications are in fact the result of a conscious choice by the governmental entity. When the government does not consider the pros and cons of a particular specification but "approves" it in form only, then the contractor, and not the government, makes the effective choice. In such cases, it cannot be said that the specification "represents a judgment" of the government, *In re Air Crash Disaster*, 769 F.2d at 121, or has been "established" by the government. Accordingly, where a specification originates with the contractor, the defendant must prove that the government actually

considered the particular specification and decided to make it a part of the plans or design for the project. Such an inquiry is a factual one, and conclusions will, of course, vary greatly according to the circumstances.[6]

### III.

█ In granting summary judgment in favor of National on the basis of the government contractor defense, the district court concluded that it was "undisputed" that the cofferdams were constructed in strict accordance with the plans "supplied by PennDOT," and that Beaver Valley's damages were caused by the "fact" that PennDOT called for the construction of cofferdams, not the "manner of their construction." We disagree. The record indicates several genuine issues of material fact as to what were the specifications for the cofferdams, as to which specifications were "approved" by PennDOT, and concerning whether and to what extent specifications were followed by National.[7]

**6.** We note that there is substantial authority and scholarly commentary to the effect that the government contractor defense ought not to apply where, in a particular case, the plaintiff is able to sue the government directly or the defendant contractor can seek contribution or indemnification from the government. *See McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir.1983); *In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 1242, 1247 (E.D.N.Y.1984) (Weinstein, J.) (dictum); *Littlehale v. E.I. duPont De Nemours & Co.*, 268 F.Supp. 791, 803 n. 17 (S.D.N.Y.1966) (dictum), *aff'd*, 380 F.2d 274 (2d Cir.1967); Note, *The Government Contract Defense: Is Sovereign Immunity a Necessary Prerequisite?*, 52 Brooklyn L.Rev. 495, 522–26 (1986). It is arguable that none of the rationales for the government contractor defense is meaningful where such is the case. Moreover, it is conceivable that, under Pennsylvania law, PennDOT has waived its sovereign immunity and thus could be sued in state court for negligence or trespass in regard to its participation in the design and construction of the Beaver River bridge. *See* 42 Pa.Cons.Stat.Ann. § 8522(b)(4) (sovereign immunity waived where suit is premised on "dangerous condition of Commonwealth agency real estate"); § 8522(b)(6) (sovereign immunity waived where suit is premised on "care[,] custody[,] or control of Commonwealth parties, including Commonwealth-owned personal property and property of persons held by a Commonwealth agency...."); *Lutzko v. Mikris, Inc.*, 48 Pa.Cmwlth.

75, 410 A.2d 370, 371, 373 (1979) (failure to maintain proper drainage resulting in flooding of plaintiff's land constitutes "dangerous condition" within meaning of § 5110(a)); *Templeton v. Hempt Bros.*, 42 D & C 3d 235, 242 (Cmnwlth. Ct.1985) (where plaintiff alleged runoff caused by highway construction, which caused break in sewer, plaintiff stated claim within § 8522(b)(4)). Although we concluded in *Brown* that the defense was still alive in Pennsylvania, *Brown* addressed a situation in which the federal government would have been immune from suit under the *Feres–Stencel* doctrine rather than one in which the governmental entity could in fact be sued by the plaintiff. *See* 696 F.2d at 248–49. Nevertheless, the parties have not raised this issue and it is, accordingly, not before us.

**7.** We note that the defendant bears the burden of proving each element of the government contractor defense, *see In re "Agent Orange" Product Liability Litigation*, 534 F.Supp. 1046, 1055 (E.D.N.Y.1982), and that on summary judgment this means that National, as the party-movant that bears the ultimate burden of persuasion at trial, must establish that there is no genuine issue of material fact as to every element of the defense. *See Celotex v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting). Despite the fact that it follows from this precept that summary judgment should not have been granted if there existed only one of such issues, *see id.*, we will

## A.

As Beaver Valley points out, the Baker plans clearly provide for the construction of three pipes, or culverts, each 48 inches in diameter. These pipes would have considerably increased the flow of the river during the more than two years of construction, thereby alleviating some of the problems of which Beaver Valley complains. Accordingly, if the plans called for pipes, it is likely that the omission of pipes was a material divergence from the plans and one that caused harm to Beaver Valley.

National's own submissions regarding construction of the cofferdams do not contain a reference, pictorial or otherwise, to pipes. Nor does National contest the fact that no pipes were ever constructed in the cofferdams. The conflicting state of the plans as to the pipes raises the issue of whether the provisions for pipes in the Baker plans should be considered a "specification" that should have been, but was not, followed by National. If the Baker plans governed the project in regard to the pipes, then there can be no doubt that the provision for pipes was "established" by the government. If, however, National's own plans superseded the Baker plans, and if approval of those plans, without a provision for pipes, meant that PennDOT had "established" that the cofferdams would not contain pipes, then the government contractor defense protects National with respect to the failure to include the pipes in its construction of the cofferdams.

We first conclude that there exists a genuine issue of material fact as to whether National's plans superseded the Baker plans. Ironically, this conclusion is compelled by the affidavit of Michael Hearn, submitted by National in support of its motion. Hearn stated that National's submissions "complied" with the Baker plans. Since the Baker plans clearly call for pipes and National's submissions do not, the plans can only "comply" with each other if National's submissions omitted reference to pipes on the understanding that, at least as far as pipes were concerned, the Baker

consider all the contentions raised by the par-

plans governed. This view was confirmed at oral argument, where National conceded that the Baker plans were the first plans used in the construction of the cofferdams, and that National's later plans concerned the phasing, or scheduling aspects, only. At the least, this concession raises a factual issue that should not be resolved on summary judgment.

Even if the Baker plans were superseded by National's plans, we would find that the district court erred in implicitly finding no genuine issue of material fact as to governmental approval of National's omission of a provision for pipes in its set of plans. On this record, we do not believe there is sufficient evidence to preclude a factual finding that PennDOT did not consider or approve the absence of pipes in the cofferdams. The first, conditional approval of National's plans mentioned only that PennDOT approved the "general cofferdam *sequence* scheme submitted," app. at 519 (emphasis added), and requested more detail. Each page of the February 7 resubmission was headed "proposed cofferdam sequence," app. at 241–43, and the February 26 approval by PennDOT of that sequence scheme merely noted that the submission had been approved. Thus National's plans, and the responses of PennDOT, appear to have been concerned primarily, or perhaps even solely, with the sequence of the cofferdam construction, an issue unrelated to the presence or absence of pipes.

Where a specification with such a clear impact on the consequences of a project is initially required by the government, a subsequent submission of the contractor addressing a different issue merely omits that requirement without discussion, and the government fails to mention the omission in giving general approval to the submission, a trier of fact might well conclude that the government did not "substantial[ly] review," *In re Air Crash Disaster*, 769 F.2d at 123, and approve that highly material omission. Accordingly, the district court was incorrect in concluding that there was no genuine issue of material fact regarding this issue.

ties to clarify the issues on remand.

### B.

█ The situation is different with regard to the government's approval of a lengthening of the East-bank cofferdam. The original plans submitted by Baker and National called for a cofferdam on the East side of the river that would leave almost two pier-widths of free river (approximately 200 feet) during the "phase 2" construction of the southbound bridge. Beaver Valley complains that in fact National only left one pier-width (about 120 feet) of free river.

National, however, specifically requested permission of PennDOT to extend the East-bank cofferdam an additional pier-width during the "phase 2" construction. Penn-DOT approved that request on July 25, 1986. It therefore is clear on this record that, as to damages arising out of the extension of the cofferdam during the period of time specifically approved by Penn-DOT, National can invoke the government contractor defense.

### C.

Beaver Valley urges that the West-bank cofferdam was not removed in accordance with National's own plans, that National thus did not follow the timing "specification," and that the government contractor defense cannot therefore be invoked as to that issue. National's drawings dated February 7, 1985 note that "the present time schedule calls for," app. at 240, the West-bank cofferdam to be completely removed in July 1986. Hearn's affidavit, submitted by National, acknowledges that the cofferdam was not removed until June 1987. Although Hearn argued that some of the delay through 1986 was caused by Penn-DOT, Hearn and National offer no explanation for delaying removal of the west-bank cofferdam until June 1987.

We doubt, however, that the time schedule here ought to be considered a "specification" in the sense of a particular aspect of performance that the government expects to be followed. The use of the language "present time schedule calls for ..." —language used by National and arguably approved by PennDOT—is not mandatory in nature. Ordinarily, an aspect of performance that is not specified in the contract, or one that is merely precatory, would not be subject to the government contractor defense.[8] A contractor, however, may be able to invoke the defense if it can prove that the schedule or other aspect of performance as executed by the contractor was a necessary consequence of the project. *See Ference*, 88 A.2d at 414. In *Ference*, for example, the earth slide that obstructed the road, causing the plaintiffs' damages, was not actually called for in the construction plans. Rather, the Pennsylvania Supreme Court concluded that the obstruction was a necessary consequence of the contractor's non-negligent execution of the government's plans. In this context, National's summary judgment was not correctly granted unless National has shown that there is no genuine issue of material fact concerning the question of whether, in leaving the West-bank cofferdam in the river until June 1987, National exceeded what was necessarily a consequence of performance in accord with the government's specifications.

█ On this record, National has failed to point to any reason for keeping the West-bank cofferdam in the river for the six months from January to June 1987. Even regarding the period before 1987, National's evidence at best creates a genuine issue of material fact as to what execution of the government's plans reasonably required, *see Ference*, regarding the length of time the cofferdams remained in the river.[9]

8. Admittedly, however, the issue of what has been "specified" can be a difficult one. *See Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 745 (11th Cir.1985).

9. Beaver Valley also argues that National (1) failed to provide standby equipment to breach the dam during high water, (2) failed to follow a contract provision calling for "cooperat[ion] with the public utility companies ... in the placement, replacement, relocation, adjustment, or reconstruction of their structures and facilities during construction," app. at 219, (3) failed to follow a contract provision requiring National to resubmit its cofferdam plan to the "appropriate regulatory agencies" if it differed "sub-

**1220**

## IV.

On appeal, Beaver Valley raises two issues regarding the propriety of the district court's denial of its motion for summary judgment. First, Beaver Valley argues that, as a matter of law, it was a third-party beneficiary of the contract between PennDOT and National and that National is therefore liable to it for any breaches of that contract. Second, Beaver Valley argues that National was negligent per se in its construction of the bridges.

## A.

■ The basis for Beaver Valley's third-party beneficiary theory lies in the following language from PennDOT's general contract specifications, incorporated by reference into the PennDOT–National contract:

107.12 CARE OF PUBLIC AND PRIVATE PROPERTY—Do not damage overhead and underground structures or property within or adjacent to the project. Use special care in the performance of the work in order to avoid interference or damage to operating utilities or plants; however, where there is any possibility of interference or damage, make satisfactory arrangements with responsible corporate officers of the utilities or plant, covering the necessary precautions to be used during the performance of the work. Make these arrangements, subject to review, before work is started.

Protect all land monuments and property markers which are to be affected by the construction until they have been correctly referenced by the Department. Beyond the construction area, reset monuments and markers which are disturbed by contract operations, either during the

construction of the project or otherwise, when and as directed.

Promptly make restitution for or satisfactorily repair or restore damaged public or private property. Protect trees to be left standing. If these existing trees to be left standing are damaged, satisfactorily repair or replace them, at no expense to the Department, or compensate the Department for the damage by an equitable monetary amount as determined by, or agreed with, the Department.

App. at 236–37.

This language raises two issues: Whether it evinces an intent to make the owners of "damaged public or private property" third-party beneficiaries and, even if it evinces such an intent, whether this language applies to Beaver Valley's damages. Given our view regarding the second of these issues, we need not address the first.

The phrase "make restitution for or satisfactorily repair or restore damaged public or private property" in the third paragraph must be read in context. The property referred to is only that "within or adjacent to the project." This limitation and the specific examples given of the kind of damage for which a contractor would be responsible (i.e., property monuments, trees, overhead and underground wires and cables, etc.) indicate that the drafters had in mind damage directly inflicted by construction activity of the contractor. This section does not mention other kinds of environmental damage—damage that foreseeably could be caused to noncontiguous land or property owners. Yet other sections of the specifications (but ones not even arguably creating a third-party beneficiary status) do mention waterways and suggest a concern with the interests of the owners of riparian property. *See* §§ 107.10, 107.13. We con-

---

stantially," app. at 222, from the plans "previously approved" by the Corps; (4) failed to reapply for a permit after the original one expired on December 31, 1985.

Regarding the standby equipment, National's evidence that it did maintain such equipment at the cofferdams during construction is equivocal at best. Accordingly, a genuine issue of material fact exists as to whether and when such equipment was present at the construction site.

As to cooperation with the utilities, however, the cited language refers to relocation or adjustment of the *utilities'* facilities. We do not believe this language can reasonably be interpreted as creating a duty on National's part to relocate Beaver Valley's power plant. Finally, the breaches of National's contract asserted in contentions 3 and 4 do not appear to be material; that is, Beaver Valley does not explain how these breaches caused its damages.

clude that, in context, the language relied upon by Beaver Valley simply does not apply to owners of noncontiguous land who are damaged by raised water levels.[10]

■ Moreover, we think that Beaver Valley's argument proves too much. If, as argued by Beaver Valley, the "damaged public or private property" for which National must make restitution referred to in § 107.12 encompasses damages caused by raised water levels, then National would be liable to Beaver Valley for any and all damage caused by those raised water levels. Yet it is clear that the decision by PennDOT to use a cofferdam—a decision that indisputably *was* PennDOT's in the first instance—would inevitably cause some damage to Beaver Valley's ability to generate power. Thus Beaver Valley's argument rests on the premise that National intended to assume liability, for which nothing in its contract would give it recourse against PennDOT, for the certain effects of PennDOT's decisions even where those decisions were executed non-negligently—where National was not at fault and had merely done what PennDOT asked it to do. Nothing in the language cited by Beaver Valley suggests that the parties intended for National to assume such potentially onerous strict liability.[11]

### B.

■ Beaver Valley argues that the district court should have entered summary judgment in its favor because National was negligent per se, and committed a per se

public nuisance, because of its violations of the Dam Act, 32 P.S. § 693.1 *et seq.* For a legislative enactment to be considered as "fixing a standard for all members of the community, from which it is negligence to deviate," the act must first of all "provide[ ] that under certain circumstances particular acts shall or shall not be done...." W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser & Keeton on the Law of Torts* § 36 at 220 (1984). Pennsylvania follows the formulation articulated in § 286 of the Restatement (Second):

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

*See Miller v. Hurst,* 302 Pa.Super. 235, 448 A.2d 614, 618 (1982).

Beaver Valley first argues that, since the original DER permit lapsed and National built and maintained cofferdams without a valid permit, National was in violation of 32 P.S. § 693.6(a)[12] and thus negligent per se. Permit and licensing requirements, however, are not usually viewed as creating

---

**10.** Beaver Valley has pointed to nothing in the record that would support the view that its property is "adjacent" to the bridge-building site. To prevail on its motion for summary judgment, as the party that bears the ultimate burden of proof at trial, Beaver Valley must present evidentiary support showing there is no genuine issue of material fact as to all the elements of each theory of recovery.

**11.** Beaver Valley also cites an indemnification provision in favor of PennDOT, contained at § 107.14, as endowing it with third-party beneficiary status. This argument is without merit. The purpose of an indemnification provision such as this one is to require the promisor to be responsible for claims against either the promisor, the promisee, or both. Those claims are

ones that arise out of some provision of law outside the contract. It is not the purpose of an indemnification provision to enlarge the universe of such claims by allowing others to make claims against the promisor that, but for the indemnification provision, they would not otherwise have. Nor does the promisee intend to confer a benefit on some third party claimant; he seeks rather to protect himself in the event that the promisor is found liable under some provision of law.

**12.** That section provides that "[n]o person shall construct, operate, maintain, modify, enlarge or abandon any dam, water obstruction or encroachment without the prior written permit of the department."

per se rules of civil liability. *See Prosser and Keeton on Torts* § 36 at 226. This is true because such general licensing or permit schemes do not usually establish standards of competence; they do not usually represent judgments that a violation of the licensing scheme will generally constitute the breach of a duty to a particular person rather than to the state. Whereas certain violations of legislative acts are thought to represent legislative judgments that a particular invaded interest ought to be protected against a particular hazard resulting in a certain kind of harm, *see, e.g., Congini by Congini v. Portersville Valve Co.*, 504 Pa. 157, 470 A.2d 515, 518 (1983) (violation of law against serving liquor to minors constitutes negligence per se), thus warranting a per se rule, when the legislature attaches sanctions to the failure to obtain a valid license, it does not usually focus on a particular class of persons, interest, harm, or hazard. Thus the failure itself to obtain a license is not usually considered a negligent act. Beaver Valley does not cite us to any provision or interpretation of the Dam Act that convinces us that, in this context, the result ought to be any different.

■ Beaver Valley also points to the following language in the Dam Act that it asserts has been violated by National:

(a) The owner[13] of any dam, water obstruction or encroachment shall have the legal duty to:

(1) monitor, operate and maintain the facility in a safe condition in accordance with the regulations, terms and conditions of permits, approved operating plans and orders of the department issued pursuant to this act;

.  .  .  .  .

(3) immediately notify the department and responsible authorities in downstream communities of any condition which threatens the safety of the facility, and take all necessary actions to protect life and property, including any action required under an emergency plan or

department order issued pursuant to this act.

32 P.S. § 693.13.

These provisions do not create standards of care in any more specific sense than the law of negligence in general. Unlike those legislative enactments whose violation is considered to constitute negligence per se, *compare Miller v. Hurst*, 302 Pa.Super. 235, 448 A.2d 614, 618 (1982) (violation of law requiring dog to be kept on leash constitutes negligence per se), they do not describe particular acts that should or should not be done. The general exhortations to maintain the facility in a "safe" condition and to take "necessary" action to protect property at most tell the permit holder to act as the reasonable person would. They do not provide guidance as to a legislative judgment that the failure to engage in certain conduct constitutes negligence; rather, they raise questions much like the question of whether particular conduct should be considered negligent: whether a person has maintained a dam in a "safe" condition and whether a person took "necessary" action. Accordingly, we do not think the Pennsylvania Supreme Court would deem these provisions suitable for adoption as a per se standard of negligence.

### V.

For the foregoing reasons, we will reverse the summary judgment in favor of National, affirm the denial of Beaver Valley's motion, reverse the dismissal of Baker's motion for summary judgment, and remand this case to the district court for proceedings in accordance with this opinion.

---

**13.** "Owner" is defined as "[a]ny person who owns, controls, operates, maintains, or manages a dam or reservoir, water obstruction or en-croachment." 32 P.S. § 693.13. We may assume, without deciding, that National constituted an "owner" for the purposes of the Dam Act.